UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

WILLIAM DILLON; SCOTT GRAUE;
DAVID HODGES; ALBERT LOVE; and
JAYSON SAYLOR, individually, and on behalf
of a class of others similarly situated,                    Case No. 3:14-cv-00820-YY

              Plaintiffs,                                    FINDINGS AND
                                                            RECOMMENDATIONS
     v.

CLACKAMAS COUNTY and CRAIG
ROBERTS, both individually and in his official
capacity as Sheriff,

              Defendants.

YOU, Magistrate Judge:

## INTRODUCTION

Plaintiffs are former inmates of the Clackamas County Jail ("CCJ").  In this putative class

action, plaintiffs allege that their federal constitutional and state statutory rights were violated by

visual strip searches[1] they endured during incarceration.  This case was originally filed on May

18, 2014, and included as named plaintiffs William Dillon ("Dillon"), Scott Graue ("Graue"),

and David Hodges ("Hodges").[2]  On May 4, 2015, those three plaintiffs, and two additional

named plaintiffs, Albert Love ("Love") and Jayson Saylor ("Saylor"),[3] filed a Second Amended

Complaint ("SAC"),[4] alleging claims for:  (1) violation of the Fourth and Eighth Amendments to

the United States Constitution ("First Claim"); and (2) invasion of personal privacy under ORS

---

[1]  Plaintiffs allege only "visual" body cavity searches.  They do not allege that CCJ engaged in
routine "digital" body cavity searches of inmates.  As used in this opinion, "visual strip search"
denotes "visual body cavity searches" as that term is used in CCJ policies and described in more
detail below, and as distinguished from any "clothed" searches conducted at the CCJ.

[2]  The initial Complaint included claims for violation of the Oregon Constitution, but the state
constitutional claims were omitted from later pleadings.

[3]  Plaintiffs voluntarily dismissed Saylor as a named plaintiff on January 9, 2017 (ECF #65).

[4]  Plaintiffs' request to further amend the complaint was denied on April 21, 2017 (ECF #102).

30.865 ("Second Claim").  SAC, ECF #31.  Defendants include Clackamas County ("the County") and the County Sheriff, Craig Roberts ("Roberts").

The parties have filed the following motions:  (1) Defendants' Motion for Summary Judgment, ECF #58; (2) Plaintiffs' Motion to Certify the Class, ECF #79; (3) Plaintiffs' Motion for Partial Summary Judgment, ECF #82; and (4) Defendants' Motion to Dismiss for Lack of Jurisdiction, ECF #127.

Defendants assert that subject matter jurisdiction is lacking due to the terms of the Prison Litigation Reform Act of 1995, 42 USC § 1997e(e), as to any claims brought by plaintiffs who were in custody at the time the Second Amended Complaint was filed on May 4, 2015.  Additionally, defendants raise arguments under Article III of the United States Constitution, asserting that plaintiffs lack standing to pursue this case both:  (1) at all due to the fact that none of the current plaintiffs was an inmate at the CCJ at the time of filing of the SAC; and (2) as to any of the claims of unconstitutional searches on behalf of female inmates at CCJ.  Finally, defendants seek summary judgment against:  (1) all claims alleged against Roberts under 42 USC § 1983, both on the ground that he did not personally participate in any of the allegedly unlawful conduct and because he is entitled to qualified immunity; and (2) the claim for violation of ORS 30.865 due to failure to comply with the Oregon Tort Claims Act ("OTCA").

Both sides seek summary judgment that the searches did (or did not) violate any constitutional guarantee.  Additionally, plaintiffs seek to certify this case as a class action under FRCP 23(b) on behalf of all class members who have undergone unjustified and unreasonable visual strip searches at CCJ since May 19, 2012.[5]  Finally, plaintiffs seek to certify two subclasses, one involving persons in CCJ custody searched in group and public strip searches from September 25, 2012, forward ("Class One"), and another involving a group of inmates searched on October 10, 2012 ("Class Two").

For the reasons that follow:  (1) Defendants' Motion to Dismiss for Lack of Jurisdiction (ECF #127) should be DENIED; (2) Defendants' Motion for Summary Judgment (ECF #58) should be GRANTED as to plaintiffs' claims for alleged constitutional violations based on the emergency shakedown search of October 10, 2012, and GRANTED as to all claims under the

---

[5]  Plaintiffs sometimes give a date of May 12, 2012, a date more than two years before this case was filed.  *See* Mot. Class Certification 3, 9, ECF #79.  However, the SAC identifies May 19, 2012, as the beginning of the relevant period.  SAC ¶¶ 43, 48, ECF #31.  Given the May 18, 2014 filing date of this case, it appears the May 12 reference is a typographical error, and that the correct date is May 19, 2012.

Eighth Amendment. Otherwise, Defendants' Motion for Summary Judgment (ECF #58) should be DENIED; (3) Plaintiffs' Motion to Certify the Class (ECF #79) should be GRANTED as to Class One, but only as to the Fourth Amendment claims of male inmates at the CCJ who underwent return-from-court visual strip searches between September 25, 2012, and the date in May 2013 the County installed privacy panels in CCJ's hallway. Plaintiffs William Dillon, Scott Graue, David Hodges, and Albert Love should be appointed as class representatives of Class One. Additionally, Leonard Berman should be appointed as class counsel. In all other respects, Plaintiffs' Motion to Certify (ECF #79) should be DENIED; and (4) Plaintiffs' Motion for Partial Summary Judgment (ECF #82) should be DENIED.

**FINDINGS**

**I.      Factual Background[6]**

   **A.      Custodial Status**

Dillon, Graue, and Hodges filed this action on May 18, 2014 (Complaint, ECF #1), and filed the SAC (ECF #31) naming Love and Saylor (who was later dismissed as a named plaintiff) as additional plaintiffs on May 4, 2015.

Dillon was in CCJ custody from November 2012 until early 2013, and was not part of the October 10, 2012 group strip search. Decl. William Dillon ("Dillon Decl.") ¶ 2, ECF #85. However, he avers that he "suffered humiliating public group searches in 2013 without justification." *Id.* On May 18, 2014, when this case was filed, Dillon lived outside of Clackamas County. Complaint ¶ 3. It is unclear whether he was in custody or out of custody at that time. A year later, on May 4, 2015, when the SAC was filed, Dillon was in jail custody in Oregon, but not at the CCJ. SAC ¶ 12, ECF #31.

It is unclear whether Graue or Hodges were in custody when this case was initially filed on May 18, 2014. Complaint ¶ 3, ECF #1. However, Graue, Hodges, and Love were in CCJ custody at various times between February 2011 and September 2014, and were each subjected to the October 10, 2012 group visual strip search. Decl. Kevin Thies ("Thies Decl.") ¶ 19, ECF #59; Decl. Scott Graue ("Graue Decl.") ¶ 2 (ECF #83); Decl. David Hodges ("Hodges Decl.") ¶ 2 (ECF #86); Am. Decl. Albert Love ("Am. Love Decl.") ¶ 2 (ECF #89); Decl. Lee Eby ¶ 4, ECF #23 (noting that Dillon, Graue, Hodges, and Love were no longer in CCJ custody as of

---

[6] On February 1 and 17, 2018, the parties submitted a Concise Statement of Disputed Material Facts, ECF #142, and Amended Response to Concise Statement of Material Facts Regarding Motion for Partial Summary Judgment, ECF #145. The factual information herein relies primarily on those documents.

September 22, 2014).  At the time the SAC was filed on May 4, 2015, Love lived out of jail

custody in Multnomah County and Dillon, Graue, and Hodges were in jail custody at a facility

other than the CCJ.  SAC ¶¶ 12, 14; *see also* ECF #54, at 2 (indicating that, as of October 2016,

Graue was confined at Snake River Correctional Facility and Hodges was confined at Oregon

State Penitentiary).

> **B.**    **County Search Policy**

The relevant County policy regarding searching inmates who are in the custody of CCJ

are set forth in CCJ Policies § 25.47.  *See* ECF #33-1.   The policy provides that searches are

conducted "on a routine and random basis" with "[s]pecial attention . . . to inmates" who are:

> 1.  returning to the facility from court, medical/dental transports,
> and other venues outside the jail;
> 2.  moving from their assigned housing area to another area of the
> jail;
> 3.  whose cells or living area are being searched;
> 4.  who are working as inmate vendors; and
> 5.  who are being transported from the jail to another venue.

*Id*. at 1-2, CCJ Policies § 25.47.4(C).

Among other provisions, the visual body cavity search policy states:

> **Visual Body Cavity Search.** Visual body cavity searches are
> unclothed searches which include a visual inspection of the anus
> and/or genital area; generally, requiring the subject to bend over
> and spread the cheeks of the buttocks, to squat, and/or otherwise
> assume a posture which more fully exposes body cavity orifices.
> Visible body cavity search procedures will be done in compliance
> with the following guidelines:
>
> *         *         *
>
> b. visual body cavity searches will be done in a manner that
> reasonably ensures inmates being searched can only be observed
> by:  1) staff members conducting or assisting with the search;
> 2) staff members working in the area; and, 3) other inmates being
> searched at the same time.
>
> *         *         *
>
> f. visible body cavity searches should be performed for inmates:
> 1) returning to the facility; 2) in or leaving administrative
> segregation (or other restricted area); 3) prior to transportation to
> court, a medical clinic or other such venues: 4) during work
> projects outside the jail perimeter; 5) as part of a cell shakedown;
> 6) returning from other activities within the facility; 7) an in-transit
> courtesy hold for another criminal justice agency; 8) going to,
> while involved in, and/or returning from work release; 9) returning
> from contact visits; 10) entering or exiting their living areas; and
> 11) reasonable suspicion exists that they may be in possession of
> contraband.
>
> g. Unclothed searches should be performed for detainees:

> 1) when Corrections Deputies have reasonable suspicion that an
> inmate is in possession of a weapon, drug, or other contraband;
> 2) whose charges or history involve violence, weapons, drugs, or
> felony-person charges; 3) who are inmates, parolees, or
> probationers under the jurisdiction of the Oregon Department of
> Corrections; or, 4) serving a sentence ordered by the courts.

*Id*. at 3-4, CCJ Policies § 25.47.4(D)(3).

## C.    The "Public" or "Group" Searches at CCJ

Plaintiffs allege that their constitutional rights were violated by "group" and/or "public" visual strip searches conducted both:  (1) routinely when they and other CCJ inmates returned from court proceedings; and (2) during an "emergency shakedown" on October 10, 2012.[7]

### 1.    Routine Searches Conducted on Inmates Returning From Court

Plaintiffs assert that, while housed at CCJ, they were subjected to repeated "public" or "group" visual strip searches involving 5-15 inmates at a time, occurring twice a day following morning and afternoon court transports.  These visual strip searches took place in CCJ hallways and holding rooms where the inmate being searched could see other inmates naked and vice versa.  Dillon Decl. ¶ 3, ECF #85; Graue Decl. ¶ 3, ECF #83; Hodges Decl. ¶ 3, ECF #86; Am. Love Decl. ¶ 3, ECF #89.  Additionally, at least prior to the installation of "privacy panels," the hallway visual strip searches allowed:  (1) other deputies to "watch [inmates] naked remotely" on the CCJ's internal video monitors ("CCTV") at any one of ten computer terminals located throughout the CCJ;[8] (2) female deputies staffing the "records window" to see inmates naked; and (3) inmates being searched to be seen naked by other deputies passing by in the hallways and by and female inmates performing laundry duties.  Dillon Decl. ¶¶ 3-6; ECF #85; Graue Decl. ¶¶ 3-6, ECF #83; Hodges Decl. ¶¶ 3-6, ECF #86; Am. Love Decl. ¶¶ 3-6, ECF #89; ECF #88-7 at 7-9, 21.[9]

_____

[7]  Although the SAC does not expressly limit plaintiffs' claims to searches taking place under these conditions, these are the only initiating events (after returning to CCJ from court proceedings or during the October 10, 2012 emergency shakedown) identified in plaintiffs' declarations, or in the deposition excerpts submitted by plaintiffs in response to defendants' motion.  *See* Dillon Decl. ¶ 3, ECF #85; Dillon Depo at 44-45, ECF #109-4, at 2; Graue Decl. ¶ 3, ECF #83; Hodges Decl. ¶ 3, ECF #86; Hodges Depo. at 13, ECF #109-6, at 3; Am. Love Decl. ¶ 3, ECF #89; Love Depo. at 21, ECF #109-7, at 2.

[8]  CCJ uses over 200 cameras to monitor jail activity.  Decl. Lee Eby ¶ 6, ECF #111.  Interior cameras show views of the booking and intake areas, housing areas, and common areas but do not show showers or toilets, and, with limited exceptions, do not show the interior of jail cells.  *Id*. ¶¶ 10, 15-18.

[9]  Sometimes two inmates at a time would be visually strip searched with each inmate on different sides of a divided shower stall.  Plaintiffs aver that "the deputy would wait at the door and have us two present next to each other naked and we had no semblance of privacy there

In May 2013,[10] the County installed "privacy panels" in CCJ's "back" hallway. ECF #88-7 at 21, ECF #109-2, at 11. These panels consist of six curtains that extend outward a few feet into the hallway from the wall, creating five "stalls" where deputies can search individual inmates, and provide spaces where inmates being searched can see only the lower portion of other inmates' legs. *See* ECF ##88-5, 88-7, at 18-19. The panels do not prevent other deputies from walking down the hallway, but "there is no reason" for deputies not conducting the search to be in the area. ECF #88-7, at 18-19.

### 2.    October 10, 2012 "Emergency Shakedown" Search

In addition to routinely conducting visual strip searches of inmates returning to CCJ from court appearances, on October 10, 2012, CCJ staff conducted a search covering the CCJ's first floor housing area as part of an "emergency shakedown." Declaration of Kevin Thies ("Thies Decl.") ¶ 2, ECF #59. The emergency shakedown took place at approximately 6:00 p.m., after CCJ staff discovered that that a 3.5 inch long, .75 inch wide, "thin" piece of metal had been broken off of one of the computers in the first floor library. *Id.* ¶ 3. Corrections staff had reason to believe the missing piece of metal could be modified to be used as a stabbing weapon and to believe it was in the possession of an inmate in the first floor housing area of the CCJ. *Id.* ¶¶ 4-5. As a result, the CCJ was placed on lockdown status, meaning all inmates were locked into their cells and no inmate movement was permitted absent necessity. *Id.* ¶ 6. The Corrections Emergency Response Team ("CERT") then conducted visual strip searches in the area immediately outside inmates' cells, two or three cells at a time, in groups of no more than six inmates. *Id.* ¶¶ 8-10, 12. Once each group of inmates was visually strip searched, they dressed and were relocated to the CCJ day room. *Id.* ¶ 14. The CERT then conducted searches of the vacant cells. *Id.* ¶ 14. Once the cells were searched, the inmates were moved back to their cells, and the CERT searched the CCJ day room. *Id.* All remaining plaintiffs excluding Dillon were present for the October 10, 2012 emergency shakedown and visual strip search.

---

either." Dillon Decl. ¶ 8, ECF #85; Graue Decl. ¶ 8, ECF #83; Hodges Decl. ¶ 8, ECF #86; Am. Love Decl. ¶ 8, ECF #89; ECF 88-7, at 17. However, the SAC does not mention these "shower" searches. Dillon testified that, upon his return to CCJ in February 2011, he was searched in a "little shower setting . . . that was . . . private and . . . appropriate" and did not involve other inmates seeing or looking in, or staff walking by. ECF #109-5, at 3. Moreover, the shower areas are not viewable by CCTV cameras, or by female deputies near the "records window" or performing laundry duties. Thus, these searches are outside the scope of the "public" searches that form the basis of plaintiffs' claims.

[10]    It is unclear exactly when the County installed the privacy panels, but plaintiffs date the installation to May 2013. Mot. Class Cert. 2, ECF 79; *see also* ECF #88-7, at 15-16.

**D.**     **Proposed Classes Identified in the SAC**

In the SAC, plaintiffs identify three proposed classes.  Each of the classes describes the offending visual strip search methodology as involving deputies who:

> A. Inspects the individual from top to bottom;  B. Inspects his hair, ears, mouth, hands, armpits, feet, between toes, nostrils; C.  Inspects a woman's breasts or tells a man to separate his penis and testicles; D.  Inspects beneath the foreskin of an uncircumcised male; E.  Requires the individual to bend and spread buttocks; F.  Requires the individual to face a wall so staff can inspect the back of the body.

SAC 5-7, ECF #31.

All named plaintiffs are proposed class representatives of "Class One," which consists of a class period from September 25, 2012, through May 4, 2015, and is identified as the following persons, subjected to the offending search methodology:

> All persons (including pre-trial detainees and convicted inmates) who were or currently are in the custody of the CCJ regardless of charges, who have been or will be searched while unclothed in a group and public setting in open areas involving one or more deputy who [engaged in the offending search methodology].

SAC 5-6, ECF #31.

Additionally, all named plaintiffs are proposed class representatives of "Class Two," which consists of a class period involving a one-time public search on October 10, 2012, and is identified as:

> All persons (including pre-trial detainees and convicted inmates) who were or currently are in the custody of the CCJ regardless of charges, who were searched while unclothed in a group and public setting in open areas involving one or more deputy who [engaged in the offending search methodology].

SAC 6 (ECF #31).

Finally, Dillon, Graue, and Hodges are proposed class representatives of "Class Three," consisting of a class period commencing September 25, 2012, and extending to the date on which the County is either enjoined from, or ceases to conduct, the allegedly unlawful visual strip searches, and is identified as:

> All persons (including pre-trial detainees and convicted inmates) who are or will be placed into the custody of the CCJ regardless of charges, who have been or will be searched while unclothed in a group and public setting in open areas involving one or more deputy who [engaged in the offending search methodology].

SAC 6-7 (ECF #31).

*///*

## II.  Preliminary Issues

### A.  Key Terms and Nature of the Return-From-Court Hallway Searches

Among other issues raised in the pending motions, plaintiffs seek to certify two classes and both sides seek summary judgment on the issue of whether the daily return-from-court searches conducted at CCJ were or were not constitutional.  Both of those requests require identification of the nature of the allegedly unconstitutional action, as well as consideration of how the named plaintiffs' claims compare with those of absent class members.  A review of the SAC, the parties' briefs, and the available evidence reveal four issues that call for clarification.

First, the language used in the SAC is exceptionally broad, and uses expansive and undefined terms like "group" or "public" searches.  However, so far as the pleadings and available evidence reveal, the "group" nature of the searches is meant to convey that more than one inmate was searched at a time, meaning that individual inmates being searched could be seen naked by other inmates being searched, such as during the emergency shakedown search of October 10, 2012.  The term "public" is apparently meant to encapsulate three additional features of the return-from-court searches, namely that (in addition to being seen by other inmates being searched due to the "group" nature of the searches), naked inmates could be seen:  (1) over CCTV on television monitors located at multiple other locations in CCJ and accessible to both male and female deputies; (2) by female inmates performing laundry duties; and (3) by female deputies near the records window.

Second, the allegations cover all inmates housed at CCJ without regard to gender and without regard to booking status by including both pretrial detainees and convicted inmates.  All of the current named plaintiffs are male and nothing in the record identifies their status (pretrial detainee or convict) during their respective stays in CCJ.  Nevertheless, for the reasons discussed below, plaintiffs' booking status does not affect the claims this court concludes should be certified for class treatment.  Similarly, this court concludes that plaintiffs should be permitted to act as class representatives only for the claims of other male inmates and former inmates.  Thus, plaintiffs' booking status and gender affect the nature of the class that should be certified, but do not otherwise preclude a ruling on the pending motions.

Third, the pleadings describe the searches as both taking place "after court hearings and on a routine schedule" as well as "randomly, after hearings and on a routine schedule," and in a "random and/or routine fashion," SAC ¶¶ 1, 35-36, 43, 48, 70-71, ECF #31.  So far as revealed

in the record, and excluding the one-time emergency shakedown search of October 10, 2012, the only evidence indicates that the inmates' return to CCJ from court proceedings was the justification for all of the searches at issue in this case.  There is no indication that other "random" searches are at issue.

Fourth, the pleadings do not mention installation of the privacy panels in CCJ's hallway at all, yet the evidence submitted by the parties indicates that such privacy panels (in the form of shower-curtain-like dividers) creating five "stalls" in CCJ's hallway, were installed in approximately May 2013, before this case was filed.  No admissible evidence indicates that, following installation of the privacy panels, the interior of the "stalls" could be viewed over the CCTV cameras, by female deputies in the "records window" area, or by female inmates performing laundry duties.[11]  Moreover, none of the plaintiffs' declarations indicate that they were ever searched at CCJ following installation of the privacy panels and each plaintiff except Hodges indicates that he was no longer in custody at CCJ by May 2013.  *See* Graue Decl. ¶ 2, ECF #83 (in CCJ from February 2011 to April 2013); Dillon Decl. ¶ 2, ECF #85 (in CCJ from November 2012 to "early 2013"); Hodges Decl. ¶ 2, ECF #86 (in CCJ "from approximately 2012 to 2013"); Am. Love Decl. ¶ 2, ECF #89 (in CCJ from "Mid 2012 to early 2013").

As discussed below, these issues affect both the analysis of the parties' cross-motions for summary judgment on the constitutionality of the searches, as well as the proper scope of any certified class claims.

### B. Dismissal for Lack of Subject Matter Jurisdiction

In addition to those pleading and factual nuances, two preliminary legal issues merit discussion at the outset.  These include defendants' arguments that:  (1) plaintiffs' claims must be dismissed for lack of subject matter jurisdiction because three of the four remaining named plaintiffs were in custody when plaintiffs filed the SAC and seek compensatory damages for mental and emotional suffering yet make no showing of a physical injury as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 USC 1997e(e); and (2) issues of standing

---

[11]   In their briefing, plaintiffs argue that "female laundry workers can see men naked in the hallway, even with privacy curtains installed."  Pls.' M. Partial Summ. J. 4, ECF #82.  However, no declaration or deposition testimony supports that argument.

under Article III of the United States Constitution prevent the current plaintiffs from pursuing this case at all or, alternatively, from pursuing claims on behalf of female CCJ inmates.[12]

### 1.      PLRA Bar

Three of the four named plaintiffs were in jail custody, somewhere other than at the CCJ, at the time the SAC was filed on May 4, 2015.  Defendants argue that those plaintiffs' claims cannot be heard by this court due to the PLRA's "physical injury" requirement, 42 USC 1997e(e), which states that "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ."  Defendants contend that this court lacks subject matter jurisdiction over plaintiffs' claims because plaintiffs seek recovery exclusively for mental and emotional injuries as a result of being strip searched.

As plaintiffs point out, the PLRA's limitations apply only to claims brought by confined prisoners.  Thus, the provisions of the PLRA do not affect the claims asserted by Love, who defendants acknowledge was not in custody at the time he was added as a named plaintiff upon the filing of the SAC.

Moreover, while it is correct that, absent a showing of physical injury, compensatory damages premised upon alleged mental or emotional injuries are barred under this portion of the PLRA, that is as far as the bar goes:  "To the extent that [plaintiffs have] actionable claims for compensatory, nominal or punitive damages—premised on violations of [constitutional] rights, and not on any alleged mental or emotional injuries—we conclude the claims are not barred by § 1997e(e)."  *Oliver v. Keller*, 289 F.3d 623, 630 (9th Cir. 2002).

In the SAC, each of the four remaining plaintiffs generally alleges that he has suffered and continues to "suffer damages."  SAC ¶¶ 46 (Graue), 51 (Hodges), 56 (Dillon), 61 (Love), ECF #31.  Additionally, although plaintiffs seek compensatory damages, they also alternatively assert entitlement to "nominal compensatory damages."  SAC ¶ 42, ECF #31.  The first claim contains an allegation regarding defendants' liability "for the damages of the named Plaintiff(s) and members of the Class(es)."  SAC ¶ 73.  And the Second Claim alleges that "Plaintiffs and the Class suffered damages."  SAC ¶ 80.  The pleadings also repeatedly assert an entitlement to

---

[12]  The standing issue regarding representing female CCJ inmates was raised in defendants' Motion for Summary Judgment, ECF #58, but is best addressed along with the issue of an alleged lack of standing due to custodial status raised in defendants' Motion to Dismiss, ECF #127.  Defendants discuss a number of other issues in their Reply to their Motion to Dismiss, ECF #134.  However, those issues were not raised in their initial motion to dismiss and are addressed in the context of the remaining motions for summary judgment and to certify the class.

punitive damages.  SAC, ¶¶ 10, 82-85, Prayer (section C).  As in *Oliver*, plaintiffs' claims for

compensatory, nominal, and punitive damages premised upon violations of their constitutional

rights, and not on alleged mental or emotional injuries, are not barred by § 1997e(e).  *See also*

*Hammond v. Dep't of Pub. Safety*, 2011 WL 6210869 at *4 (D. Haw. Dec. 14, 2011) ("While

Plaintiff cannot recover damages on his claims for humiliation and embarrassment, under *Oliver*

and its progeny he may recover compensatory, punitive, and/or nominal damages for the

violation of his Fourth and Fourteenth amendment rights, if he can establish a violation.").  Thus,

defendants' argument that the PLRA ousts this court of subject matter jurisdiction over

plaintiffs' claims should be rejected.

### 2.    "Standing"

Defendants make two arguments regarding standing.  First, they contend that, because

none of the remaining named plaintiffs was in custody at the CCJ when the SAC was filed, this

court lacks subject matter jurisdiction over their claims.  Second, defendants contend that

plaintiffs, who are all male, lack standing to pursue the claims of any female CCJ inmates.

Standing is a fundamental, non-negotiable "irreducible constitutional minimum."

*Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016).  In class actions, "standing is satisfied if at

least one named plaintiff meets the requirements."  *Bates v. United Parcel Service, Inc.*, 511 F.3d

974, 985 (9th Cir. 2007) (*en banc*) (citing *Armstrong v. Davis*, 275 F.3d 849, 860 (9th Cir.

2001)).  Conversely, "if a class representative lacks standing at the time the complaint is filed,

the entire class action should be dismissed."  *Sherman ex rel. Sherman v. Koch*, 623 F.3d 501,

506 (7th Cir. 2010) (citation omitted).

Issues of standing are easily conflated with those of class certification.  *Melendres v.*

*Arpaio*, 784 F.3d 1254, 1261-62 (9th Cir. 2015), *cert. denied*, 136 S.Ct. 799 (2016).  The Ninth

Circuit has adopted the "class certification approach" to assess Article III standing in the context

of a class action.  *Id*. at 1262-63.  Under that approach, "'once the named plaintiff demonstrates

her individual standing to bring a claim, the standing inquiry is concluded, and the court

proceeds to consider whether [FRCP] 23(a) prerequisites for class certification have been met.'"

*Id*. at 1262 (quoting WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 2:6 (5th ed.

2017)).  "Under the class certification approach . . . '[r]epresentative parties who have a direct

and substantial interest have standing; the question whether they may be allowed to present

claims on behalf of others who have similar, but not identical, interests depends not on standing,

but on an assessment of typicality and adequacy of representation.'" *Id*. at 1262 (quoting 7AA CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE & PROCEDURE § 1785.1 (3d ed. 2017)).

Standing "is meant to ensure that the injury a plaintiff suffers defines the scope of the controversy he or she is entitled to litigate." *Id*. at 1261.   Each of the four remaining plaintiffs avers that he was subjected to unlawful visual strip searches, either during the one-time emergency shakedown search conducted on October 10, 2012, or at other times when returning from court during his term of incarceration at CCJ.   Dillon Decl. ¶ 2, ECF #85; Graue Decl. ¶ 2, ECF #83; Hodges Decl. ¶ 2, ECF #86; Am. Love Decl. ¶ 2, ECF #89.   As in *Melendres*, defendants' various arguments raise questions not of "standing," but of the propriety of class certification "*i.e.*, whether the named plaintiffs are adequate representatives of the claims of the unnamed plaintiffs."  *Id*. at 1262.   Thus, defendants "standing" arguments should be rejected and instead should be addressed in the context of plaintiffs' motion to certify a class.

## III.   Motions for Summary Judgment

Several other issues are presented in the parties' summary judgment motions. Defendants contend they are entitled to summary judgment against plaintiffs' Second Claim for invasion of personal privacy under ORS 30.865, asserting that:  (1) plaintiffs failed to comply with the OTCA; (2) the claim is barred by the statute of limitations; and (3) Roberts is improperly named as a defendant.   With regard to the First Claim for violation of plaintiffs' constitutional rights, defendants seek summary judgment that both the October 10, 2012 emergency shakedown searches and the daily return-from-court searches pass constitutional muster.   Plaintiffs oppose defendants' motion and, in turn, seek summary judgment on liability as to the daily return-from-court searches.[13]

### A.   State Statutory Claim

Plaintiffs' claim for invasion of privacy is subject both to a two-year statute of limitations (ORS 30.865(3)) and to the notice requirements of ORS 30.275.   Plaintiffs allege that a "tort claim notice from Graue including twenty-three other inmates (including Saylor, Hodges and Love) timely issued on January 21, 2013."  SAC ¶¶ 47, 52, 62, 68, 81, ECF #31.   The applicable notice provision requires that notice of the claim be given within 180 days after the alleged loss or injury.   ORS 30.275(b).   By that timetable, the January 21, 2013 tort claim notice covers

---

[13]   Plaintiffs' motion is directed at the "public group searches" visible by "cross-gender deputies and female laundry workers," and otherwise directed at the "daily" return-from-court hallway searches.   Pls.' Mot. Summ. J. 4, 12, ECF #82.

plaintiffs' claim to the extent it is based on actions on or after July 25, 2012. As noted above, it was not until the filing of the SAC, on May 4, 2015, that plaintiffs first alleged a statutory tort claim for invasion of privacy.

Defendants argue that simple math dooms plaintiffs' Second Claim: Any event on or prior to the tort claim notice of January 21, 2013, necessarily took place more than two years prior to plaintiffs' first allegation against defendants of a statutory tort under ORS 30.865 in the SAC filed on May 4, 2015. Nevertheless, defendants' argument that they are entitled to summary judgment on the Second Claim based on this chain of events should be rejected.

Plaintiffs assert that the SAC alleged an "ongoing tort" and that their pending motion for class certification will, if granted, "expand[] the statute of limitations retroactively. . . ." Pls.' Resp. in Opp'n to Mot. Summ. J. 2, ECF #81. They also assert that the SAC relates back to the filing of the original complaint due to the common nucleus of operative facts. *Id.*

The continuing violations doctrine can sometimes ward off a statute of limitations challenge, but does not apply to "discrete acts, each of which allegedly violated [plaintiffs'] constitutional rights." *Atwood v. Or. Dep't of Transp.*, 2008 WL 803020 at *2 (D. Or. 2008). Instead, discrete acts "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id* (citation omitted). Each discrete act "'starts a new clock for filing charges alleging that act.'" *Id*. (citation omitted). The continuing violations doctrine "applies where there is no single incident that can fairly or realistically be identified as the cause of significant harm." *Flowers v. Carville*, 310 F.3d 1118, 1126 (9th Cir. 2002) (internal quotation marks and citation omitted).

Plaintiffs' claims are not in the nature of a series of events that, only cumulatively, amount to a violation. Instead, they allege a series of impermissible searches, each independently actionable. Thus, the continuing violations doctrine provides plaintiffs no basis for avoiding defendants' statute of limitations argument.

Nevertheless, the relation-back doctrine provides plaintiffs the necessary traction. "Where, as here, state law provides the applicable statute of limitations, an amended complaint may relate back to the filing of the original complaint if it satisfies either state or federal law on relation back." *Walters v. Cal. Dep't of Corrs.*, 2018 WL 341792 at *6 (Jan. 9, 2018) (citing *Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1200 (9th Cir. 2014), *R. & R. adopted*, 2018 WL 1900021 (E.D. Cal. Apr. 20, 2018). When considering whether the claims in the

amended pleading relate back, federal trial courts are required to consider both the Federal Rules of Civil Procedure, as well as applicable state law, and "employ whichever affords the 'more permissive' relation back standard." *Butler*, 766 F.3d at 1201 (quoting *Coons v. Indus. Knife Co.*, 620 F.3d 38, 42 (1st Cir. 2010)). This analytical framework provides a "one-way ratchet, meaning that a party is entitled to invoke the more permissive relation back rule, whether it is the state rule or the federal rule set out in [FRCP] 15(c)(1)(C)." *Coons*, 620 F.3d at 42 (internal quotation marks and citations omitted). Both FRCP 15(c)(1)(B) and ORCP 23(c) call for the amended pleading to relate back when the claim set out in the amended pleading arises out of the "conduct, transaction, or occurrence" set forth, or attempted to be set forth in the original pleading.

In this case, the offending conduct identified in the SAC is identical to the offending conduct described in the original complaint. Defendants have offered no argument that the claims in the SAC do not arise out of the conduct placed at issue in plaintiffs' original complaint. Accordingly, under either federal or state law, the SAC relates back to the filing of the original complaint and defendants' argument regarding the statute of limitations should be rejected.

Defendants also contend that no claim for violation of ORS 30.865 may be pursued against Roberts in his individual capacity, as the OTCA "eliminate[d] any claim against any officer, employee, or agent for their work-related torts. In place of a claim against an individual, the legislature substituted a single claim against the public body, subject to its attendant damages limitation." *Jensen v. Whitlow*, 334 Or. 412, 417 (2002) (*en banc*) (citing ORS 30.265(1)). Despite the dicta in *Jensen*, the SAC does not expressly allege a specific amount of damages, and defendants have presented nothing to support the conclusion that plaintiffs allege damages in an amount less than the statutory caps in the OTCA, leaving the door open for plaintiffs to name individual County employees. *See McLean v. Pine Eagle Sch. Dist. No. 61*, 194 F.Supp.3d 1102 (D. Or. July 1, 2016) (noting that defendants "could have requested in discovery or by motion that Plaintiff specify the amount of damages she seeks" and denying motion to substitute public body in place of individual defendants under ORS 30.265(3)). Thus, Roberts's request for summary judgment against the Second Claim should be denied.

///

///

///

**B.**    **Constitutional Claims Based on Visual Strip Searches**

**1.**    **Constitutional Claims Alleged Against Roberts**

Roberts also seeks judgment against the constitutional claims alleged against him under 42 USC § 1983 because he did not personally participate in the alleged constitutional violations. In the SAC, plaintiffs allege that the "strip search custom, practice and policy . . . was promulgated by senior [Sheriff's] Department officials, including . . . Roberts" and that "Roberts is the . . . final decision-maker . . . with respect to the treatment of pre-trial and other detainees over which [the County] exercises custodial or other control." SAC ¶¶ 5, 17, ECF #31. Furthermore, plaintiffs allege that Roberts "is responsible for establishing the policies, customs, practices, and procedures to be utilized in the operation of [the CCJ], and is responsible for the implementation of the strip search policy questioned in this lawsuit and/or ratified the policy." *Id.* ¶ 74, ECF #31.

"Under Section 1983, supervisory officials are not liable for actions of subordinates on any theory of vicarious liability. A supervisor may be liable only if (1) he or she is personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's conduct and the constitutional conduct." *Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) (quotation marks omitted) (citations omitted). Thus, a supervisory officer "can be held liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Blankenhorn v. City of Orange*, 485 F.3d 463, 485 (9th Cir. 2007) (quotation marks and alteration omitted) (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)). Accordingly, supervisory liability can be found "even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of a constitutional violation." *Crowley*, 734 F.3d at 977 (citing *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).

In response to defendants' motion, plaintiffs have submitted no evidence that could reasonably be construed as establishing that Roberts is liable based on his own culpable action or inaction, acquiescence in the alleged constitutional deprivation, or conduct that showed a reckless or callous indifference to the rights of CCJ inmates. The CCJ Search Policy expressly contemplates that inmates being searched may at times see and be seen by other staff working in

the area or by other naked inmates who are also being searched.  CCJ Policies

§ 25.47.4(D)(3)(b), ECF #33-1.  However, that provision is a directive to take efforts to limit the

number of third parties who can observe a visual strip search, not a directive to permit such third-

party viewing.  Moreover, plaintiffs have submitted no evidence tending to establish that Roberts

was involved in promulgating that provision or any other provision of the CCJ Search Policy.

Instead, they rely on the bare allegation of his job title as Sheriff.  Absent any basis for a causal

linkage specifically between actions taken or refused by Roberts and CCJ's allegedly deficient

search policy, their claims against him are barred.

     If this court grants judgment to Roberts against the individual-capacity constitutional

claims, the official-capacity claims against him should likewise be dismissed:  "An official

capacity suit against a municipal officer is equivalent to a suit against the entity.  When both a

municipal officer and a local government entity are named, and the officer is named only in an

official capacity, the court may dismiss the officer as a redundant defendant."  *Ctr. for. Bio-*

*Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't.*, 533 F.3d 780, 799 (9th Cir. 2008)

(citations omitted).  Accordingly, Roberts should be granted judgment against all claims alleged

against him under 42 USC § 1983.

### 2.     Constitutionality of the Visual Strip Searches

     The SAC alleges that the visual strip searches at issue in this case violated both the

Fourth and Eighth Amendments.  Both sides seek summary judgment that the group visual strip

searches conducted at CCJ either do (or do not) pass constitutional muster.

### a.     Eighth Amendment

     "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel

and unusual punishment forbidden by the Eighth Amendment."  *Watison v. Carter*, 668 F.3d

1108, 1112 (9th Cir. 2012) (internal quotation marks and citations omitted).  Though the "alleged

pain may be physical or psychological," the "inmate must objectively show that he was deprived

of something 'sufficiently serious.'"  *Id.* (quoting *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir.

2009)).  Only "those deprivations denying the minimal civilized measure of life's necessities are

sufficiently grave to form the basis of an Eighth Amendment violation."  *Wilson v. Seiter*, 501

U.S. 294, 298 (1991) (internal quotation marks and citation omitted).  In addition, the inmate

must show that the prison official acted with a sufficiently culpable state of mind.  *Johnson v.*

*Lewis*, 217 F.3d 726, 733-34 (9th Cir. 2000) (citing *Wilson*, 501 U.S. at 298).

Eighth Amendment cases cover a broad range of confinement conditions: "Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety." *Id*. at 731 (citations omitted). Cases successfully alleging an Eighth Amendment claim based on the cross-gender search of an inmate are uncommon, but not unheard of. *See Jordan v. Gardner*, 986 F.2d 1521, 1525 (9th Cir. 1993) (*en banc*) (upholding Eighth Amendment claim involving clothed body searches of female prisoners by male guards). However, the mere fact that the search is a "cross-gender" search is not enough: "Cross-gender searches cannot be called inhumane and therefore do not fall below the floor set by the objective component of the Eight Amendment. The facts of cases in which courts have found Eighth Amendment violations are more severe." *Somers v. Thurman*, 109 F.3d 614, 623 (9th Cir. 1997) (internal quotation marks and brackets omitted) (citing *Johnson v. Phelan*, 69 F.3d 144, 151 (7th Cir. 1995)). In *Somers*, the court discusses a search case that met the requirements of the Eighth Amendment, involving allegations that "untrained medical assistants performed digital rectal cavity searches on unsanitary table in view of other prison personnel." *Somers*, 109 F.3d at 623 (citing *Vaughan v. Ricketts*, 859 F.2d 736, 741 (9th Cir. 1988)). In *Jordan*, the finding of an Eighth Amendment violation depended on the "court's finding of serious deprivation [based] on the 'high probability … of severe psychological injury and emotional pain and suffering … from these searches' based on the inmates' 'shocking histories of verbal, physical, and, in particular, sexual abuse." *Watison*, 668 F.3d at 1112-13 (quoting *Jordan*, 986 F.2d at 1525).

The allegations in this case simply do not compare to those in cases where the courts have allowed an Eighth Amendment claim to proceed. Here, the searches were visual only and plaintiffs rely solely on the "public" manner of the searches, emphasizing that the searches were viewable by other inmates being searched, by female deputies over the CCTV monitors, and by female inmates performing laundry duties. Based on the reasoning articulated and cases cited in *Somers* and *Watison*, this court concludes that plaintiffs' claims fail insofar as they are alleged under the Eighth Amendment. Accordingly, defendants should be granted summary judgment against all claims alleged under the Eighth Amendment.

### b.     Fourth Amendment

Under the Fourth Amendment, "the reasonableness of a particular search is determined by reference to the prison context" using a "balancing test" articulated in *Bell*:

> The test of reasonableness under the Fourth Amendment is not
> capable of precise definition or mechanical application.  In each
> case it requires a balancing of the need for the particular search
> against the invasion of personal rights that the search entails.
> Courts must consider the *scope* of the particular intrusion, the
> *manner* in which it is conducted, the *justification* for initiating it,
> and the *place* in which it is conducted.

*Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988) (quoting *Bell*, 441 U.S. at 559)

(emphasis in original).

Plaintiffs allege that the County conducts visual strip searches on inmates, regardless of

custodial status, every time the inmates return from court appearances.  The mere fact a visual

strip search is conducted, in and of itself, is an insufficient basis for a constitutional claim, given

that "[v]isual body cavity searches conducted after contact visits as a means of preventing

prisoners' possession of weapons and contraband, even absent probable cause, have been found

reasonable by the Supreme Court."  *Michenfelder*, 860 F.2d at 332 (citing *Bell*, 441 U.S. at 558-

60); *see also Bull v. City and Cnty of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (upholding

same-gender strip search "performed 'in a professional manner in an area of privacy'" of all

arrestees who were to be introduced into general jail population for custodial housing).  Thus, as

they must, plaintiffs concede that "[i]t is not the searches themselves that offend the constitution

. . . ." Pls.' Reply Mot. Partial Summ. J. 2, ECF #124.  Instead, plaintiffs take issue with the

"public, hallway and group manner," of the searches, conducted "in view of cross-gender staff

and inmates."  *Id*.

### c.       October 10, 2012 Emergency Shakedown Search

Defendants seek summary judgment against plaintiffs' constitutional claims based on the

October 10, 2012 visual strip search, conducted on approximately 160 inmates as part of an

"emergency shakedown."  In support, defendants have submitted a detailed declaration from

Lieutenant Kevin Thies, of the Clackamas County Sheriff's Department, describing the reasons

for and manner of the October 10, 2012 visual strip searches.  Thies Decl. ¶¶ 2-10.  That

evidence indicates that this one-time search was conducted after prison officials learned that a

piece of metal that could be used as a weapon was missing off of a computer in CCJ's first floor

housing area.  In response to that potential threat, CCJ officials conducted an "emergency

shakedown," opting to visually strip search inmates from two or three cells at a time in order to

rapidly search "to limit the opportunity for the possible weapon to be hidden by an inmate once it

had become apparent that there was an ongoing search for the possible weapon." *Id*. at ¶ 10.

Plaintiffs' only response to defendants' motion is a proffer of a video tape of portions of the October 10, 2012 search, and an invitation for this court to "make its own determination if any exigency prevented strip search[ing] each inmate individually in his cell while others waited outside." Pls.' Resp. Mot. Summ. J. 8, ECF #81. A review of the video reveals that male inmates were searched in groups of up to six at a time in an enclosed hallway in front of cell doors, rather than in the "open" hallway near the records window or laundry sorting area. Inmates were instructed to remove and shake out their clothing, run their fingers through their hair, show guards their ears and the inside of their mouth, and finally, fully disrobed, turn their backs to the guards and bend down. In the process, inmates were fully disrobed from one to two minutes each as the guards methodically observed each inmate's clothing and body. ECF #125.

As noted in *Michenfelder*, "so long as a prisoner is presented with the opportunity to obtain contraband or a weapon while outside of his cell, a visual strip search has a legitimate penological purpose." *Michenfelder*, 860 F.2d at 332-33 (citing *Turner v. Safley*, 482 U.S. 78, 87-88 (1987)). Plaintiffs bear "the burden of showing that [prison] officials intentionally used exaggerated or excessive means to enforce security . . . ." *Id*. at 333 (citations omitted). Here, as in *Michenfelder*, plaintiffs have failed to demonstrate that the October 10, 2012 search was conducted in the absence of an opportunity to obtain a weapon outside of their cells. Plaintiffs have offered no evidence countering defendants' assertion that the reason for the search was that a possible weapon, in the form of a piece of metal, was unaccounted for. Other than to argue that defendants created the exigency, plaintiffs have offered no evidence indicating that defendants' response to the discovery of the missing metal was exaggerated or excessive. Nor have plaintiffs offered evidence tending to indicate that the manner or place of the visual strip search was unreasonable, given the need to quickly perform a search of an entire housing unit.

Plaintiffs argue that alternative locations, including the inmates' cells, or shower stalls, could have been used to search each inmate one at a time. However, that ignores the evidence proffered by defendants of the need to conduct the search on an expedited basis in order to prevent inmates from hiding the potential weapon, and the evidence that a one-on-one search would have defeated the ability to conduct a swift search. Given the justification for initiating the emergency shakedown, and after reviewing the video recording submitted by the plaintiffs, this court concludes that the record does not support the inference that the place, scope, or manner of the search were unreasonable. Absent evidence by plaintiffs to indicate that the

methodology of the October 10, 2012 emergency shakedown search was exaggerated or excessive, defendants' motion for summary judgment should be granted against plaintiffs' constitutional claims to the extent they are premised upon the October 10, 2012 visual strip search.

### d.    Daily Return-From-Court Searches

Plaintiffs also allege that, on a daily basis since at least May 19, 2012,[14] inmates at CCJ have been subjected to visual strip searches upon returning to the CCJ from court appearances. Because court appearances arguably present a prisoner with an "opportunity to obtain contraband or a weapon while outside of his cell," the searches have a legitimate penological purpose. *Michenfelder*, 860 F.2d at 333.  As in *Michenfelder*, the searches at issue here were "visual only, involving no touching."  *Id*. at 332.  Nevertheless, the scope of the search is decidedly intrusive, with inmates fully disrobed and asked to present their intimate sexual areas and bodily orifices for detailed (albeit only visual) inspection.  It is the manner and place of the searches that plaintiffs contend violates their constitutional rights.  The searches were conducted on groups of 5-15 inmates every weekday, twice a day, and not justified by any exigent circumstance. Finally, the searches were conducted in an open room with CCTV cameras on the ceilings and visible to female inmates performing laundry duties.  ECF #109-5, at 4 (Graue Depo. 16).

Defendants strenuously urge the court to defer to the County, citing case law cautioning courts from meddling in the management of prisons.  Defendants also assert that plaintiffs' constitutional claims are barred based on the Supreme Court's ruling in *Bell*, in which the Court held that visual body cavity searches "conducted after every contact visit with a person from outside the institution" did not violate the Fourth Amendment.  *Bell*, 441 U.S. at 558.  However, *Bell* dealt with the limited issue of "whether visual body-cavity inspections . . . [could ever] be conducted on less than probable cause."  *Id*. at 560.  In answering that question in the affirmative, the Court noted that any such search must nonetheless "be conducted in a reasonable manner."  *Id*. (citing *Schmerber v. Cal.*, 384 U.S. 757, 771-72 (1966)).  In this case, plaintiffs contend that the CCJ searches were both without probable cause, performed on a routine basis, *and* "unconstitutional in their scope, manner and duration."  SAC, ¶ 7, ECF #31.  The thrust of their constitutional claims is that the County policy not only contemplates that, during visual strip searches inmates will view each other naked (*see* ECF #33-1, County Inmate Search Policy

---

[14] *See* n. 6, above.

§ 25.47.4(D)(3)(b)(3)), but that, at least until the installation of the privacy panels in May 2013, CCJ staff and administrators made no effort to ensure that visual strip searches were conducted in a manner to prevent naked inmates from being seen by other inmates and deputies not involved in the search, including female inmates and deputies.

Nothing in the record indicates that, prior to the filing of plaintiffs' tort claims notice, the County considered any measures that would have restricted the viewing of naked inmates by third parties (including female deputies and female inmates not involved in the search). Plaintiffs, on the other hand, provide little more than their nearly duplicate declarations and virtually nothing other than attorney argument regarding important factual details on such things as exactly what could be seen on the CCTV monitors and by whom, how frequently female third parties could and did view them naked, and the like. After an exhaustive review of the parties' various submissions, this court is of the view that the record is, at this point, insufficient to grant summary judgment to either party on the constitutionality of these searches under the Fourth Amendment. Accordingly, as to the return-from-court searches alleging a violation of the Fourth Amendment, the parties' cross-motions should be denied.

## IV.    Class Certification

Plaintiffs seek to certify a class action, proposing two subclasses, one of which (Class Two) consists of those class members searched in the emergency shakedown conducted on October 10, 2012. However, as discussed above, defendants' motion for summary judgment as to the constitutionality of that search should be granted  Thus, this court considers the class certification motion only as it pertains to Fourth Amendment claims premised upon the daily return-from-court searches, i.e., Class One.[15]

### A.    Class One

All named plaintiffs are proposed class representatives of "Class One," which proposes a class period from September 25, 2012, through May 4, 2015, and is identified as the following persons, subjected to the offending search methodology:

---

[15]  The SAC also proposes "Class Three," which is an "Injunctive Relief Class" extending to "the date on which the County is either enjoined from its policy, practice and custom of unlawful strip searches or ceases to conduct its policy, practice and custom of unlawful strip searches." SAC 6-7, ECF #31.  Plaintiffs do not seek certification of Class Three.

Moreover, their motion to certify discusses certification only in the context of the constitutional claims (First Claim), not in the context of the state statutory claim (Second Claim). Given that plaintiffs do not seek certification of Class Three and the recommendation discussed above that defendants should be granted summary judgment against the Eighth Amendment claims, this court limits its discussion on class certification to the Fourth Amendment claims of Class One based on the return-from-court searches.

> All persons (including pre-trial detainees and convicted inmates)
> who were or currently are in the custody of the CCJ regardless of
> charges, who have been or will be searched while unclothed in a
> group and public setting in open areas involving one or more
> deputy who [engaged in the offending search methodology].

SAC 5-6, ECF #31.

Plaintiffs select a beginning date of September 25, 2012, and an end date of May 4, 2015, which corresponds to the filing date of the SAC. However, as noted above, even that subset includes a time period of approximately two years during which privacy panels were installed in CCJ's hallway. Nothing in the record supports the conclusion that the visual strip searches conducted at CCJ following installation of the privacy panels included the same privacy concerns as presented in the searches in the "open" areas of CCJ prior to installation of the privacy panels. Moreover, no evidence supports the conclusion that any of the named plaintiffs remained in custody at CCJ following installation of the privacy panels, save perhaps Hodges, who does not attest to having been searched in the privacy stalls. Given this lack of proof, Class One should be limited in time to the beginning date selected by plaintiffs (September 25, 2012), only through the date privacy panels were installed, sometime in May 2013.

**B.   FRCP 23(a)**

To represent a class, plaintiffs must satisfy the threshold requirements of FRCP 23(a). Under FRCP 23(a), a case is appropriate for certification as a class action only if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

**1.   Numerosity**

Numerosity is satisfied if "the class is so large that joinder of all members is impracticable." FRCP 23(a)(1). As limited to the timeframe above, plaintiffs challenge strip searches occurring over a period of approximately eight months, from September 25, 2012, and continuing until installation of the privacy panels sometime in May 2013. During that time, plaintiffs contend that, on a daily basis, between 10 and 30 inmates returning to CCJ from court appearances were subjected to visual strip searches. Am. Love Decl. ¶ 9, ECF #89.

Defendants contend that the numerosity requirement is not met because Class One includes inmates who have not yet been incarcerated at CCJ or suffered the alleged harm. However, that issue does not plague Class One when it is limited to the defined timeframe above.

Counting weekdays only for the approximate 32 weeks between September 25, 2012 and mid-May 2013, and using the lowest number of inmates searched daily as identified by plaintiffs (10 per day), calculates to 1,600 inmates who are potential class members (32 weeks, times five weekdays per week, times ten inmates per day). Even accounting for days the courts were closed and for the likelihood that some inmates attended multiple court proceedings, i.e., assuming that only 10% of the total minimal number of inmates are included, still leaves a class of 160. That number is sufficient to satisfy the numerosity requirement. *See Immigrant Assistance Project of Los Angeles Cnty. Fed'n of Labor (AFL-CIO) v. INS*, 306 F.3d 842, 869 (9th Cir. 2002) (citing cases finding that classes of 39, 64, and 71 satisfied numerosity criterion). Accordingly, the numerosity requirement is met.

### 2. Commonality

FRCP 23(a)(2) requires the existence of "questions of law or fact common to the class," and FRCP 23(a)(3) further requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."

> The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.

*Gen. Tele. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n13 (1982).

The commonality standard is not strictly construed, but "has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). The commonality requirement also requires "the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (quoting *Falcon*, 457 U.S. at 157). "This does not mean merely that they have all suffered a violation of the same provision of law," but instead that their claims "depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*. at 350.

Although "even a single common question will do," *id* at 359 (internal citation, quotation marks, and brackets omitted), "[w]hat matters to class certification is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id*. at 350 (emphasis and citation omitted).

Defendants argue that commonality is not present because plaintiffs seek to vindicate rights under both the Fourth and Eighth Amendment. However, as discussed above, only the Fourth Amendment claims should proceed, mooting this argument.

Plaintiffs have otherwise satisfied the commonality requirement. When the same course of conduct allegedly injures each class member, the commonality requirement is met. *See Fonder v. Sheriff of Kankakee Cnty.*, No. 12-CV-2115, 2013 WL 5644754, at *6 (C.D. Ill. Oct. 15, 2013) (persons arrested without a warrant who share the experience of being strip searched prior to a determination of probable cause satisfied commonality requirement due to "standardized conduct towards members of the proposed class"); *see also Young v. Cnty. of Cook*, No. 06 C 552, 2007 WL 1238920, at *5 (N.D. Ill. April 25, 2007) ("Courts have consistently held that class actions challenging blanket strip search policies satisfy Rule 23(a)(2)'s commonality requirement.") (citations omitted). Here, the common element is being subjected to public group visual strip searches upon returning to CCJ from court appearances, in CCJ's open areas within the view of CCTV cameras, female deputies at the records window, and female inmates performing laundry duties. This is sufficient to establish commonality.

### 3. Typicality

Typicality is similar to the commonality requirement. "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. Because the purported cause of the proposed class members' injury is an allegedly unconstitutional policy and practice, the "typicality inquiry involves comparing the injury asserted in the claims raised by the named plaintiffs with those of the rest of the class." *Armstrong*, 275 F.3d at 869. Although the claims of the class representative need not be identical to the claims of other class members, the class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156 (internal quotation marks and citation omitted).

Defendants contend that none of the named plaintiffs' claims are typical of those of the rest of the class because none of the plaintiffs is currently in CCJ custody. However, that argument is directed at Class Three which, as discussed above, is not at issue in the present motion to certify. Apart from the injunctive relief class, defendants do not explain why the current custodial status of the named plaintiffs matters. The thrust of plaintiffs' claims is that they were improperly subjected to public, group, visual strip searches upon returning to CCJ from court appearances. Plaintiffs' core contention is that the manner of the searches was identical and allowed the same kind of group, public, and cross-gender viewing of their naked bodies with no exigency to justify the intrusion. In that regard, their claims are typical of every member of the proposed class.

Defendants also assert, when discussing whether plaintiffs have standing, that plaintiffs fail to distinguish the claims of pretrial detainees from those of convicted prisoners, and contend that the latter have no Fourth Amendment protections. The Ninth Circuit "has held that the Fourth Amendment right of people to be secure against unreasonable searches and seizures 'extends to incarcerated prisoner; however the reasonableness of a particular search is determined by reference to the prison context.'" *Thompson v. Souza*, 111 F.3d 694, 699 (9th Cir. 1997) (quoting *Michenfelder*, 860 F.2d at 332)). Whether a pretrial detainee or convict, the record here reveals no difference in the context in which the searches were conducted; thus this argument should be rejected.

Finally, defendants contend that plaintiffs lack standing to pursue claims of unconstitutional searches of female inmates. Mot. Summ. J. 15-16, ECF #58. None of the named plaintiffs is female, and the evidence submitted in support of the present motions discusses searches of male inmates and the ability of female third parties, including female deputies and female inmates, to see the naked bodies of male inmates being strip searched. Although plaintiffs discuss searches of female inmates in the SAC, and they attempted to amend the pleadings to add a female-named plaintiff, that motion was denied. SAC ¶ 20, ECF #31; ECF #102. Given the lack of any female-named plaintiffs, the lack of evidence of strip searches involving female inmates, and the differences in the searches conducted on female inmates,[16] this court concludes that plaintiffs have failed to establish that they suffered the same injury as

---

[16] The visual strip searches performed on female inmates included inspection of the breasts. SAC ¶ 20, ECF #31.

female inmates subjected to strip searches. Accordingly, Class One should be restricted to male inmates.

### 4.    Adequate Representation

The final FRCP 23(a) prerequisite, adequacy of representation, is satisfied if "the representative parties will fairly and adequately protect the interests of the class." The satisfaction of constitutional due process requires that absent class members be afforded adequate representation prior to an entry of judgment that binds them. *Hanlon*, 150 F.3d at 1020 (citation omitted). Determining the adequacy of representation requires consideration of two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id* (citation omitted). The adequacy of representation is satisfied as long as one of the plaintiffs is an adequate class representative. *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir 2001).

Defendants' only challenges to adequacy are that the named plaintiffs are not currently incarcerated at CCJ and that the dictates of "human nature" render it "highly speculative that any class representative will, upon his or her release from the [CCJ], continue to fairly and adequately protect the interests of the class." Defs.' Resp. in Opp'n M. Class Cert. 8, ECF #113. Again, with the timeframe limited as discussed above, the issue of current incarceration at CCJ poses no impediment. As for the other argument, defendants offer nothing other than their own conclusory ideas about human nature. Defendants have offered nothing indicating that the named plaintiffs have conflicts of interest with other class members, or that particular named plaintiffs have any reason not to vigorously prosecute this case on behalf of the class. Each of the named plaintiffs has attested undergoing repeated, intrusive group, public, visual strip searches. Based on their years of continued participation in this case, nothing indicates a lack of commitment on their parts. This court concludes that plaintiffs have established adequacy of representation.

### C.    FRCP 23(b)

To represent a class, plaintiffs also must satisfy one of the subsections of FRCP 23(b). Plaintiffs seek to certify Class One under FRCP 23(b)(3), or alternatively, under FRCP 23(b)(1) or (2). Class certification under FRCP 23(b)(3) is appropriate if the court finds that "questions of law or fact common to class members predominate over any questions affecting only

individual members, and that a class action is superior to other available methods of fairly and efficiently adjudicating the controversy," considering:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

The predominance of common questions of law or fact required by FRCP 23(b)(3) is "more stringent" and "far more demanding then" the commonality requirement of FRCP 23(a). *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). Nevertheless, it is met in this case.

All class members in this case are affected in the identical way. Each one was allegedly subjected to the same types of group, public visual strip searches, consisting of unclothed, visual searches in the open area of CCJ in view of CCTV cameras, female deputies near the records window, and female inmates performing laundry duties, during a defined period of time (September 25, 2012 through the date in May 2013 when the County installed privacy panels). The class is sufficiently numerous to make a class action appropriate, but not so numerous as to be unmanageable. No class member has a superior claim to controlling the litigation individually due to the similar nature of the alleged harm. Therefore, Class One meets the requirements of FRCP 23(b)(3).

### D. Appointment of Class Counsel

Under FRCP 23(c)(1)(B), an order certifying a class "must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)." Plaintiffs request that the court appoint Leonard Berman[17] as class counsel. Defendants have not objected to this request.

### RECOMMENDATIONS

For the reasons stated above:

(1) Defendants' Motion to Dismiss for Lack of Jurisdiction (ECF #127) should be DENIED;

---

[17] The motion originally sought appointment of the law firm of Geragos & Geragos as co-lead class counsel. However, after oral argument on defendants' Motion to Dismiss, the attorneys of that firm withdrew from the case. Notices of Withdrawal of Counsel, ECF ##138, 139.

(2)  Defendants' Motion for Summary Judgment (ECF #58) should be GRANTED as to plaintiffs' claims for alleged constitutional violations based on the emergency shakedown search of October 10, 2012 and GRANTED as to all claims under the Eighth Amendment.  Otherwise, Defendants' Motion for Summary Judgment (ECF #58) should be DENIED;

(3)  Plaintiffs' Motion to Certify the Class (ECF #79) should be GRANTED as to Class One, but only as to the Fourth Amendment claims of male inmates at the CCJ who underwent return-from-court visual strip searches between September 25, 2012, and the date in May 2013 on which the County installed privacy panels in CCJ's hallway.  Plaintiffs William Dillon, Scott Graue, David Hodges, and Albert Love should be appointed as class representatives of Class One.  Additionally, Leonard Berman should be appointed as class counsel. In all other respects, the motion to certify should be DENIED; and

(4)  Plaintiffs' Motion for Partial Summary Judgment (ECF #82) should be DENIED.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due Wednesday, May 16, 2018.  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

## NOTICE

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED  May 2, 2018.

/s/ Youlee Yim You
_____
Youlee Yim You
United States Magistrate Judge